1

2

3                    **UNITED STATES DISTRICT COURT**

4                    **EASTERN DISTRICT OF CALIFORNIA**

5

6    **HOWARD WEIMER,**                    **1:06-cv-00735**

7              **Plaintiff,**             **MEMORANDUM DECISION AND**
                                          **ORDER RE MOTION TO RECUSE**
8                   **v.**                **JUDGE WANGER**

9    **COUNTY OF KERN, et al.,**

10             **Defendants.**

11

12                        **I.   INTRODUCTION**

13        Before the court for decision is Defendants' motion to

14   recuse the undersigned district judge from further involvement in

15   this case.  (Doc. 7, filed Aug. 18, 2006.)[1]  Defendants contend

16   that recusal is required under 28 U.S.C. § 455(a) because

17   conclusions reached and comments made by the district court in a

18   prior habeas corpus proceeding involving the Plaintiff

19   demonstrates the district court's "deep-seated favoritism or

20   antagonism that would make fair judgment impossible."  Plaintiff

21   opposes the recusal motion.  (Doc. 14, filed Oct. 2, 2006.)

22   Defendants replied.  (Doc. 17, filed Oct. 6, 2006.)

23

24

25   _____

26        [1]    The motion to recuse was filed on behalf of the County
     of Kern, the Kern County Sheriff's Department, the Kern County
27   Welfare Department, Edward Jagels, and Edward Kleier.  (Doc. 7.)
     Jack Rutledge joined the motion (Doc. 11, filed Sept. 5, 2006),
28   as did Andrew Gindes (Doc. 15, filed Oct. 4, 2006).

                                  **1**

## II.  **BACKGROUND**

In the summer of 1984, Charlene Ashcraft accused Plaintiff of molesting her 23 years earlier, while she was a foster child residing in his home.  Based on the accusation, Kern County Child Protective Services worker Barbara Jones and Kern County Sheriff's Deputy Jack Rutledge conducted an investigation into the allegations.  The investigation involved, among other things, interviewing a number of other females who had previously resided as foster children in the Weimer home.  On September 10, 1984, Deputy Rutledge requested that the Kern County District Attorney's Office file charges against Mr. Weimer.  The next day, Deputy District Attorney Andrew Gindes filed the charges by way of a criminal information.  On March 29, 1985, following a state criminal trial conducted in Kern County, Plaintiff was convicted of child molestation.

Plaintiff was imprisoned until 1997.  In June 2004, his conviction was overturned on federal habeas corpus.  A 128-page memorandum decision issued by the undersigned district judge, granted Plaintiff's petition for habeas corpus on a number of grounds based on Findings and Recommendations (F&Rs) of the Magistrate Judge, who also recommended the Petitioner's release pending review of her F&Rs.  (*See Weimer v. Duncan*, 01:95-cv-05411 OWW SMS HC, Doc. 51, filed June 15, 2004.)  First, in a 50-page section of the analysis, the district court found cumulative prejudice stemming from repeated non-harmless errors made by Plaintiff's trial counsel.  (*Id.* at 59-109.)  Next, the district court also found that habeas corpus relief was warranted on due process grounds because instances of "later-discovered, unduly

**2**

suggestive and overreaching interview techniques utilized by Kern

County authorities around the time Mr. Weimer's case was being

developed, including improper investigative techniques used by

Deputy Rutledge in other cases," called into doubt the

reliability and integrity of accusations made by complaining

witnesses.  (*Id.* at 110.)   The district court reasoned:

> The starting point for evaluation of the due process
> claim is the evidence now properly before the Court.
> That consists of the trial record, documents appended
> to the federal Petition as exhibits, and the state
> court orders in *In re Hubbard* and *In re Kniffen* for
> which Mr. Weimer has requested judicial notice.
> Cumulatively, this evidence demonstrates a due process
> violation stemming from the likelihood that the
> evidence supporting Mr. Weimer's conviction was
> unreliable.  The timing of the Weimer investigation,
> fall of 1984 through trial in the spring of 1985, spans
> the time period when Kern County officials were
> constructing numerous other child sex abuse cases using
> methods now acknowledged to have been flawed, which
> created false accusations, and violated due process
> rights of a number of accused persons who were
> incarcerated as a result and later released after
> habeas petitions brought to light the unlawful conduct
> of county law enforcement and CPS officers.  The two
> girls' uncorroborated testimony, the only evidence
> presented against Mr. Weimer, was unreliable and "so
> infected the trial with unfairness as to make the
> resulting conviction a denial of due process."
> *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)
> (involving a due process violation claimed to be the
> result of improper prosecutorial comment).
>
> The State's argument that the due process claim
> fails  because Mr. Weimer has presented no direct
> evidence of official misconduct in development of the
> molestation charges against him is unpersuasive.
> Evidence shows a prevalent pattern and practice of
> improper investigation technique during the time period
> this case was developed, particularly by Deputy
> Rutledge the primary investigator on the case, who has
> testified that he utilized the same admittedly improper
> interview and investigation practices in every child
> molest case he worked on.  The fact that CPS workers,
> Deputy Rutledge, and District Attorney's staff failed
> to maintain records cannot defeat the claim.  Through a
> combination of judicial notice of other cases, evidence
> submitted through attachments to the Petition, and
> facts discernible from the record, it is more likely

3

than not that these agencies did undertake interviews of other former foster children who resided in the Weimer home between the mid-1960s and August 1984. Either no records of those interviews were maintained, or they were otherwise destroyed.  That fact that no such interview records were presented to the defense supports the inference the interviews were unfavorable to law enforcement and favorable to the accused.  At the very least, such records were not provided to Mr. Weimer's trial lawyer in violation of his Brady rights to any exculpatory information known to and in the possession of law enforcement.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The State's theory that improper investigation is incongruous with a theory that the girls' account derived from hysterical conversion is a red herring. The State relies on the absence of "record" evidence Kern County authorities knew the girls had been sexually victimized in the past and made false accusations in the past.  But CPS records of the girls, appended to the Petition, demonstrate the contrary is true.  This knowledge was in county files and should have been reviewed as part of the investigation.  The very reason the girls were in the foster care system and had been placed in the Weimer home was that they had suffered sexual molestation in the past.  To say that authorities, particularly CPS workers, did not "know" of the girls' past is a misrepresentation of the true facts or gross dereliction of duty by Kern County law enforcement and CPS that totally abdicated their constitutional responsibility to find the truth and to conduct fair, unbiased, and objective criminal investigations.

Equally unpersuasive is the State's present argument that the girls' respective accounts of molestation were independently inconsistent, when the prosecutor, Mr. Baird argued just the opposite at trial.  As to the issue of recantations, because the defense had credible evidence to support its theory of hysterical conversion/misidentification and prior false accusations applicable to both Dena and Myra, the fact that neither girl recanted is less significant. Although neither party presents evidence on this issue, the absence of a recantation is not dispositive in light of the totality of the evidence that casts serious doubt on the reliability of the girls' trial testimony and the improper limitations imposed by the trial judge that prevented a due process and Sixth Amendment searching inquiry into the victims' credibility.

4

1
2
3
4
5
6
7
8

It is indisputable that the credibility and reliability of the victims in child molestation cases present the most important issues for the jury.  Here, in the case of each victim, the crimes were late-reported, each victim's testimony was the sole basis for conviction and was uncorroborated by any independent evidence introduced by the prosecution. Each victim suffered from material credibility problems.  The effect of *Donnelly* due process error is not harmless.  The breakdown in the investigative process and untrustworthiness of Kern County law enforcement handling of child molest cases in 1983-85, deprived Mr. Weimer of fairly presenting his defense. The error infected the trial with unfairness and had a substantial effect on the verdicts.

9
10
11
12
13

The Findings and Recommendations [of the Magistrate Judge] are not adopted.  De novo review supports a finding that Mr. Weimer's due process rights were violated by cumulative error by his own attorney and in the proceedings that produced convictions that are constitutionally unreliable.  The Magistrate Judge's independent findings of constitutional violations which infected the convictions justified the grant of honor release. [This claim] is meritorious.

14  (*Id.* at 121-24 (footnotes omitted).)

15      After finding in favor of Plaintiff on this claim, the

16  district court included a brief section entitled "Cumulative

17  Prejudice" which is also relevant to the instant motion:

18
19
20
21
22
23
24
25
26
27
28

What is most troubling about this case is the zeal with which both the Kern County District Attorney's Office on state habeas in the state superior court, and the California Attorney General's Office, before the California Supreme Court and on federal habeas, have endeavored at all costs to sustain Mr. Weimer's convictions.  They ignore the known contemporaneous improper investigative and untrustworthy methods utilized by the Kern County District Attorney's Office in 1984-85 (Mr. Gindes) and the Kern County Sheriff through Deputy Rutledge in this case and in other child molest cases in the same time period.  Other Kern County Sheriff's Officers have been found to have engaged in similar improprieties in other cases.  Such practices were later repudiated by both agencies.  The Kern County District Attorney's Office adopted a policy by October 1985 (six months after Mr. Weimer's conviction, but before his appeal) that it would not file criminal charges on uncorroborated accusations in child molest cases where the alleged molestation occurred under ambiguous circumstances or where the

**5**

child had made prior disputed allegations of
molestation.

In view of these actions taken by both agencies,
it is incomprehensible that the State ignores and
dismisses credible evidence in this case as to the
improper investigative and interview methods used.  It
is equally unreasonable to treat Mr. McKnight's errors
in conducting the defense as harmless.  Mr. McKnight's
performance was ineffective in failing to address the
issue of the misleading statistics or otherwise to
adequately prepare Dr. Bird for his testimony; in
failing to present evidence clarifying the appearance
of the fences bordering the Weimer property.  More
significantly, Mr. McKnight abdicated his duty to
conduct a wide-ranging, penetrating cross-examination
of both victims, and seemingly compromised away Mr.
Weimer's right to cross-examination, the most powerful
engine for finding the truth, by volunteering to limit
his cross where he was limited by improperly
restrictive rulings by the trial judge.

He also failed to clarify that just because Mr.
Weimer did not participate in the day-to-day discipline
and care of foster children in his home, Mr. Weimer
still was properly considered an authority figure for
those children, including Dena and Myra.  The lack of
clarity on this point enabled the prosecutor to argue
that because Mr. Weimer did not participate in the
day-to-day care and discipline of foster children, he
could not have been considered an authority figure and
only if Mr. Weimer were perceived as an authority
figure would Dena and Myra have been susceptible to
hysterical conversion and likely misidentification
described by Dr. Bird.

In families modeled on traditions of the 1960s,
however, as in the Weimer household, fathers worked
outside the home and mothers worked in the home.  Mr.
Weimer's testimony makes clear that there was a fixed
division of labor in the household.  He did not provide
daily care to the children.  But in a traditional
family, this omission did not detract from the father's
position of authority.  Mr. McKnight did nothing to
develop this concept for the jury.

The cumulative prejudice from Mr. McKnight's trial
performance inadequacies, most especially his failures
to develop and emphasize additional impeachment of the
victims, is more than sufficient to undermine
confidence in the outcome of the proceedings.  *See
Strickland*, 466 U.S. at 694; *Visciotti*, 537 U.S. at 23,
123 S. Ct. at 359.  *See also Turner*, 158 F.3d at 457
(holding that cumulative impact of attorney errors may
be considered when assessing prejudice).

6

These instances of ineffective representation are not the only factors informing the prejudice assessment.  Claim C raises Mr. McKnight's inexplicable failure to conduct additional investigation regarding impeachment evidence as to Dena.  There was an additional basis for impeaching Myra.  Deputy Rutledge's report attributes an incident of sodomy by Mr. Weimer after the sexual intercourse behind the garage, but Myra never described sodomy in any other account.  This discrepancy adds to the accumulation of undermining factors.  Finally, the manner in which the investigation of Mr. Weimer's case was conducted, judged by admissible evidence, establishes such unreliability that the convictions violate due process.

Evaluated against the relative weakness of the prosecution case, based on both victims' doubtful credibility, particularly the delayed reporting of the molestation and the implausibility of many, many aspects of both girls' accounts of the events.  The requirements of *Brecht v. Abrahamson*, 507 U.S. 619, are satisfied for granting relief.  The cumulative effect of these errors had an impact on the verdicts, because absent such errors, the defense should have further called into doubt the credibility and reliability of the prosecution case.  Even in a case where a district judge cannot decide the harmful effect of the errors, and is in grave doubt as to whether the errors had "a substantial and injurious effect" on the verdict, the error(s) cannot be considered harmless.  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  In this case, the constitutional errors, omissions, and violations cumulated to destroy confidence in the integrity or reliability of the convictions.

The attorney errors that abrogated effective cross examination of both complaining witnesses and the unreliability of the convictions require issuance of the writ of habeas corpus and a new trial.

(*Id.* at 124-28.)

On June 9, 2006, Plaintiff filed this civil rights suit pursuant to 42 U.S.C. § 1983, various provisions of the California Constitution, and California Civil Code § 52.1(b), against the County of Kern, the Kern County Sheriff's Office, the Kern County Welfare Department, of which Child Protective Services is a part, Edward Lawrence Kleier (the Sheriff of Kern

**7**

County from January 1983 to 1986), Bradford Darling (the Sergeant and Unit Supervisor in charge of the juvenile sex crimes unit of the Kern County Sheriff's Department), Jack Rutledge (a Deputy Sheriff who worked on the Weimer case), Edward Jagels (the District Attorney of Kern County from January 1983 to the present), Andrew Gindes (the Deputy District Attorney who filed the original information against Weimer), Carol Darling (the Sexual Abuse Program Coordinator with the Kern County District Attorney's Office from 1980 through 1987), Barbara Jones (a CPS case worker who worked on the Weimer case), and Irene Valos (another CPS case worker who worked on the Weimer case). Defendants moved to recuse the undersigned district judge on August 18, 2006.  (Docs. 7, 11, & 15.)

## III.   DISCUSSION

### A.   Legal Framework.

Defendants' recusal motion is based on 28 U.S.C. § 455(a), which provides in pertinent part that:

> (a)   Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

In general, the inquiry is whether "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Yagman v. Republic of Ins.*, 987 F.2d 622, 626 (9th Cir. 1993).  Defendants acknowledge that the standard they must meed to prevail on this motion is "very high" under the controlling Supreme Court case *Liteky v. United States*, 510 U.S. 540 (1994). (Doc. 7 at 2.)

**8**

*Litkey* held that disqualification is generally not required if a judge merely issues opinions based upon what the judge learned from his or her participation in the case or in prior proceedings.[2]  510 U.S. at 551.  The *Litkey* court emphasized that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."  *Id.* at 555.

> In and of themselves (i.e., apart from surrounding comments or accompanying opinion), [judicial rulings] cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved.

*Id.*  In contrast, disqualification may be warranted where a judge relies upon an "extrajudicial source" for information.[3]  *Id.* at 555.  At the hearing, all counsel agreed that there is no extrajudicial source which is a basis for the motion. Alternatively, even where a judge's opinions are based exclusively on "facts introduced or events occurring in the course of the current proceedings, or of prior proceedings," such opinions can warrant in "the rarest [of] circumstances" if "they

---

[2]    "It has long been regarded as normal and proper for a judge to sit in the same case upon its remand and to sit in successive trials involving the same defendant." *Liteky*, 510 U.S. at 551.

[3]    *Litkey* does not provide a great deal of guidance as to how courts should apply the extrajudicial source doctrine. *Litkey* does explain that "some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not warrant recusal," 510 U.S. at 554, but does not further distinguish between the types of extrajudicial information that would demand recusal and those that would be unoffensive.  It is not critical to understand the exact scope of the extrajudicial source doctrine here, however, as Defendants do not rely on this doctrine as a basis for disqualification.

display a deep-seated favoritism or antagonism that would make

fair judgment impossible." *Id*.

> Thus, judicial remarks during the course of a trial
> that are critical or disapproving of, or even hostile
> to, counsel, the parties, or their cases, ordinarily do
> not support a bias or partiality challenge. They may do
> so if they reveal an opinion that derives from an
> extrajudicial source; and they will do so if they
> reveal such a high degree of favoritism or antagonism
> as to make fair judgment impossible. An example of the
> latter (and perhaps of the former as well) is the
> statement that was alleged to have been made by the
> District Judge in *Berger v. United States*, 255 U.S. 22
> (1921), a World War I espionage case against
> German-American defendants: "One must have a very
> judicial mind, indeed, not [to be] prejudiced against
> the German Americans" because their "hearts are reeking
> with disloyalty." *Id*., at 28 (internal quotation marks
> omitted). Not establishing bias or partiality, however,
> are expressions of impatience, dissatisfaction,
> annoyance, and even anger, that are within the bounds
> of what imperfect men and women, even after having been
> confirmed as federal judges, sometimes display. A
> judge's ordinary efforts at courtroom
> administration-even a stern and short-tempered judge's
> ordinary efforts at courtroom administration-remain
> immune.

*Id*. at 555-56.


   **B.   Discussion**.

   Defendants assert that certain conclusions and opinions

expressed by the district court in the habeas corpus decision

have led defendants "to believe they cannot receive an impartial,

fair judgment from Judge Wanger in this case." (Doc. 7 at 4.)

Specifically, Defendants point to certain statements made in the

habeas corpus decision regarding Andrew Gindes, Jack Rutledge,

the public entity defendants, and the minor children who

testified at Plaintiff's criminal trial.

1

**1.   Comments Regarding Andrew Gindes.**

Defendants specifically point to two paragraphs from the habeas corpus decision that concern Andrew Gindes.  The first is a footnote which states:

> Mr. Gindes is the prosecutor who originally filed the information against Mr. Weimer, and suggested that investigators "FIND OUT THE REST OF THE CHILDREN PLACED IN THIS FOSTER HOME AND INTERVIEW THEM – I BELIEVE WE WOULD FIND MORE VICTIMS – I CANNOT BELIEVE THE DEFENDANT TOOK A TWENTY YEAR VACATION."  Exhibit M to Petition.  Mr. Gindes was forced to resign from the Kern County District Attorney's Office following investigation of his coercive and improper methods of investigation and interviewing in child sexual abuse cases.  State Bar records show his license is inactive.

(Habeas Corpus Decision at 112 n.72.)

That footnote relates to the court's discussion of evidence from two other California cases, *In Re Hubbard*, a habeas decision issued by the California Court of Appeals (No. F021117), and *In Re Kniffen,* a habeas decision issued by the Kern County Superior Court (HC 5528), along with six declarations submitted by children involved in other Kern County sex abuse investigations. (*See* Habeas Corpus Decision at 48-53; 111-112.)  The cases and declarations submitted indicate that the California courts found that Kern County in general, and Andrew Gindes specifically, utilized "extremely coercive interview techniques" in the course of prosecuting other child molestation cases contemporaneous to the Weimer investigation.  The district court referred to the language of the judicially noticed state court decisions.

The second paragraph of concern is contained within the habeas corpus decision's discussion of "cumulative prejudice":

> What is most troubling about this case is the zeal with which both the Kern County District Attorney's Office on state habeas in the state superior court, and the

> California Attorney General's Office, before the
> California Supreme Court and on federal habeas, have
> endeavored at all costs to sustain Mr. Weimer's
> convictions.  They ignore the known contemporaneous
> improper investigative and untrustworthy methods
> utilized by the Kern County District Attorney's Office
> in 1984-85 (Mr. Gindes) and the Kern County Sheriff
> through Deputy Rutledge in this case and in other child
> molest cases in the same time period.

(*Id.* at 124-24.)  Defendants complain that

> Judge Wanger's unsupported characterization of how Mr.
> Gindes' career as a prosecutor came to a close, his
> inclusion in the opinion of Mr. Gindes' professional
> status with the California Bar Association and his
> conclusion that Gindes engaged in "known
> contemporaneous improper investigative and
> untrustworthy methods" have led Gindes' employer,
> County of Kern, and his supervisor, District Attorney
> Edward Jagels, to believe that Judge Wanger possesses a
> deep-seated antagonism toward Mr. Gindes and that
> County of Kern cannot receive a fair and impartial
> hearing in this matter since Mr. Gindes, is a named
> defendant in his capacity as a County employee and his
> conduct is being attacked by plaintiff.

(Doc. 7 at 5.)

First, the district court's conclusion in the habeas corpus decision that Gindes engaged in "known contemporaneous improper investigative and untrustworthy methods" is entirely supported by the state decisional record that was placed before the court in the Weimer habeas corpus matter.  This record included the two California court decisions (*In re Hubbard* and *In re Kniffen*), the declarations from children involved in other Kern County sex abuse investigations, and a contemporaneous report prepared by the California Attorney General's Office concerning sex abuse investigations in Kern County.  (The Attorney General's report is summarized at pages 43 through 48 of the Habeas Corpus Decision.) The district court's ruling was based on information the presiding judge learned from state court decisions and the

**12**

Attorney General's report, information that was solely gained

from h participation in the habeas case.  This is exactly the

type of ruling that is protected by *Litkey*.

> [J]udicial remarks during the course of a trial that
> are critical or disapproving of, or even hostile to,
> counsel, the parties, or their cases, ordinarily do not
> support a bias or partiality challenge. They may do so
> if they reveal an opinion that derives from an
> extrajudicial source; and they will do so if they
> reveal such a high degree of favoritism

*Litkey,* 510 U.S. at 555.

Second, Mr. Gindes' professional status with the California

Bar Association is a matter of public record.  The district

court's citation to that information can neither be considered a

reference to an extrajudicial source nor an expression of bias or

partiality.

Finally, the district court cannot specifically recall the

basis for the statement about Mr. Gindes' departure from the Kern

County District Attorney's Office.[4]  In any case, the comment was

made in passing (in a footnote) in connection with the conclusion

that at the time of the habeas corpus proceedings, Kern County

had ample reason to know that the interview techniques used by

Mr. Gindes in investigations contemporaneous to the Weimer

investigation were under scrutiny.  That conclusion was fully

supported by record evidence.

---

[4]    Defendants do not in their motion to recuse assert that
such information was not part of the public record or otherwise
untrue.  If the assertion is untrue, the statement could have
been corrected.  No party or attorney ever brought to the court's
attention any inaccuracy in the statement.  If the information is
erroneous or irrelevant to the issues presented in this case, any
such evidence would not be admissible in any future proceeding
and cannot prejudice any defendant.

**13**

### 2. Comments Regarding Jack Rutledge.

With respect to Defendant Rutledge, Defendants maintain that no direct evidence regarding what Rutledge did in connection with the Weimer investigation was produced by Plaintiff during the habeas corpus proceeding. Rather, Defendants assert that both Plaintiff and the district court relied upon what Rutledge did in other cases. Defendants point to a portion of a paragarph from the habeas corpus decision in which the district court rejected Defendants' argument that "Mr. Weimer [] presented no direct evidence of official misconduct in development of the molestation charges against him." (Habeas Corpus Decision at 121.) The portion of the district court's reasoning to which Defendants take exception is as follows:

> Evidence shows a prevalent pattern and practice of improper investigation technique during the time period this case was developed, particularly by Deputy Rutledge the primary investigator on the case, who has testified that he utilized the same admittedly improper interview and investigation practices in every child molest case he worked on.

(*Id.* at 121-22.)[5]

---

[5]   Defendants also, again, take exception to the first paragraph of the habeas corpus decision's discussion of "cumulative prejudice," which mentions deputy Rutledge.

> What is most troubling about this case is the zeal with which both the Kern County District Attorney's Office on state habeas in the state superior court, and the California Attorney General's Office, before the California Supreme Court and on federal habeas, have endeavored at all costs to sustain Mr. Weimer's convictions. They ignore the known contemporaneous improper investigative and untrustworthy methods utilized by the Kern County District Attorney's Office in 1984-85 (Mr. Gindes) and the Kern County Sheriff through Deputy Rutledge in this case and in other child molest cases in the same time period.

Defendants argue that "Judge Wanger's conclusion that Deputy Rutledge had utilized improper and untrustworthy methods in [the Weimer] case because of his activities in other cases has led defendants to believe that Judge Wanger cannot view impartially the evidence of what Mr. Rutledge did in the Weimer investigation."  (Doc. 7 at 6.)

First, Defendants portray the district court's reasoning in an overly narrow manner.  The entire paragraph from which Defendants' excerpt is taken reads as follows:

> The State's argument that the due process claim fails because Mr. Weimer has presented no direct evidence of official misconduct in development of the molestation charges against him is unpersuasive.  Evidence shows a prevalent pattern and practice of improper investigation technique during the time period this case was developed, particularly by Deputy Rutledge the primary investigator on the case, who has testified that he utilized the same admittedly improper interview and investigation practices in every child molest case he worked on.  The fact that CPS workers, Deputy Rutledge, and District Attorney's staff failed to maintain records cannot defeat the claim.  Through a combination of judicial notice of other cases, evidence submitted through attachments to the Petition, and facts discernible from the record, it is more likely than not that these agencies did undertake interviews of other former foster children who resided in the Weimer home between the mid-1960s and August 1984.  Either no records of those interviews were maintained, or they were otherwise destroyed.  That fact that no such interview records were presented to the defense supports the inference the interviews were unfavorable to law enforcement and favorable to the accused.  At the very least, such records were not provided to Mr. Weimer's trial lawyer in violation of his Brady rights to any exculpatory information known to and in the possession of law enforcement.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

(Habeas Corpus Decision 121-22.)  The district court examined a

---

(Habeas Corpus Decision at 124-25.)  With respect to Deputy Rutledge, this passage is merely a summary of the conclusions reached elsewhere and is similarly supported by the record.

wide range of admissible evidence available in the Weimer case.

Among other things, the district court found the absence of

investigative agencies' record-keeping consistent with a finding

that it was more likely than not that improper investigative

techniques were utilized in the Weimer investigation.   Moreover,

the habeas corpus decision notes that "Deputy Rutledge testified

in the *Hubbard* case that he followed the same interview practice

for all child interviews and that he *never* changed his practice

during his entire tenure on the child sexual abuse unit." (*Id*.

at 111.)   Finally, Rutledge admitted in *In re Hubbard* that he

lacked specific training in conducting interviews of child molest

victims and he was unfamiliar with the standards for recruitment

and training of peace officers established by P.O.S.T. (*Id*. at

50.)

Most importantly, with respect to the habeas corpus

decision's conclusions regarding Deputy Rutledge, Defendant has

utterly failed to demonstrate why such comments show any bias by

the assigned district judge.   Although Defendants may take

exception with the soundness of relying upon other cases as

evidence of a pattern of misconduct, this is what the law calls

for in civil rights cases where a *Monell* claim is raised.   The

other cases are matters of public record and cannot constitute an

extrajudicial source.   Nor, do the conclusions themselves exhibit

any kind of bias or partiality.   Rather, they are inferences

based entirely on information the presiding judge learned from

his participation in the case.   Such comments do not warrant

disqualification under *Litkey*.   Moreover, they are not binding

for the purposes of this civil action, as the parties and issues

**16**

are different.

In their reply brief, Defendants reiterate their concerns with the district court's comments about Defendants Rutledge and Gindes as follows:

> [T]here is no evidence in the habeas corpus record as to what Defendant Rutledge did in the Weimer investigation. Other than a note in a file, there is no evidence in the habeas corpus record as to what defendant Gindes did, if anything, in the Weimer case. There is no evidence in the habeas corpus record of how children in the Weimer investigation were interviewed. Nevertheless, relying on information from other cases not before the court and which did not involve Mr. Weimer or the children involved in the Weimer investigation, Judge Wanger concluded that Gindes and Rutledge and the institutional defendants completely abdicated their constitutional responsibilities and violated Mr. Weimer's constitutional rights and, in reaching that conclusion, offered comments and opinions that, when viewed objectively, show a deep-seated antagonism toward the defendants that makes fair judgment impossible....The fact that those opinions and comments may have had their root in the opinions and comments of others does not diminish the concern that, when viewed objectively, such opinions and comments reflect partiality.

(Doc. 17 at 2.)  It appears, facially, that Defendants simply take issue with the conclusions reached by the district court in the habeas case which were based in part on the decisions of the California courts and the Attorney General's review of such conduct.  The appropriate remedy for such concerns is appeal, not recusal of the judicial officer from subsequent related proceedings.  *See In Re Focus Media, Inc.*, 378 F.3d 916, 930 (9th Cir. 2004).  No party appealed the district court's grant of the habeas petition.

### 3.   Comments Regarding the Public Entity Defendants.

Defendants concisely summarize their concerns with respect

to the comments in the habeas corpus decision regarding the

public entity defendants:

> In ruling on the Weimer habeas corpus petition, Judge Wanger drew extensively from sources that commented on the investigations in other Kern County cases that were under way during approximately the same time as the Weimer investigation. It appears from Judge Wanger's conclusions that he has pre-judged the agency defendants' conduct in the Weimer investigation and that it will be impossible for the agency defendants to receive fair judgment in the civil matter.

(Doc. 7 at 6.)  As examples, Defendants cite the following

comments and opinions expressed in the habeas corpus decision:

> The timing of the Weimer investigation, fall of 1984 through trial in the spring of 1985, spans the time period when Kern County officials were constructing numerous other child sex abuse cases using methods now acknowledged to have been flawed, which created false accusations, and violated due process rights of a number of accused persons who were incarcerated as a result and later released after habeas petitions brought to light the unlawful conduct of county law enforcement and CPS officers.  (Habea Corpus Decision at 121.)

> The State's argument that the due process claim fails because Mr. Weimer has presented no direct evidence of official misconduct in development of the molestation charges against him is unpersuasive. Evidence shows a prevalent pattern and practice of improper investigation technique during the time period this case was developed, particularly by Deputy Rutledge the primary investigator on the case, who has testified that he utilized the same admittedly improper interview and investigation practices in every child molest case he worked on. The fact that CPS workers, Deputy Rutledge, and District Attorney's staff failed to maintain records cannot defeat the claim. Through a combination of judicial notice of other cases, evidence submitted through attachments to the Petition, and facts discernible from the record, it is more likely than not that these agencies did undertake interviews of other former foster children who resided in the Weimer home between the mid-1960s and August 1984. Either no records of those interviews were maintained, or they were otherwise destroyed. That fact that no such interview records were presented to the defense supports the inference the interviews were unfavorable to law enforcement and favorable to the accused. At the

very least, such records were not provided to Mr. Weimer's trial lawyer in violation of his Brady rights to any exculpatory information known to and in the possession of law enforcement.  (Id. at 121.)

To say that authorities, particularly CPS workers, did not "know" of the girls' past is a misrepresentation of the true facts or gross dereliction of duty by Kern County law enforcement and CPS that totally abdicated their constitutional responsibility to find the truth and to conduct fair, unbiased, and objective criminal investigations. (Id. at 123.)

The breakdown in the investigative process and untrustworthiness of Kern County law enforcement handling of child molest cases in 1983-1985, deprived Mr. Weimer of fairly presenting his defense. The error infected the trial with unfairness and had a substantial effect on the verdicts.  (Id. at 124.)

Defendants assert that these comments indicate that "Judge Wanger has pre-judged the matter" to such an extent that Defendants "do not believe they can receive a fair and impartial judgment in the civil case." (Doc. 7 at 8.)  For example, Defendants maintain that "Judge Wanger's conclusion that Kern County law enforcement and CPS may have totally abdicated their constitutional responsibilities has lead the defendants to believe that Judge Wanger will not be able to view their activities any differently in the context of the civil case." (Id.)  Defendants are concerned that "[s]hould a CPS worker or law enforcement official state they were unaware of the sexual abuse history of someone placed in the Weimer home, Judge Wanger will either reject such testimony as untruthful or conclude the employee abdicated their constitutional responsibility though there may be other considerations that come into play."  (Id.) Finally, Defendants are concerned that "Judge Wanger has [already] concluded that the agency defendants are culpable in this matter because of activities reportedly undertaken in other

**19**

cases occurring around the same time." (*Id.*)   Specifically,
Defendants assert that in the habeas corpus decision the district
court was "willing to draw inferences from presumed facts which
result[ed] in a conclusion that Weimer's *Brady* rights were
violated." (*Id.* at 7.)   This is of particular concern to
Defendants, "[g]iven that plaintiff is now suing for alleged
*Brady* violations arising out of the same facts...." (*Id.*)

Without revisiting the entire reasoning of the habeas corpus
decision, it is sufficient to point out that none of the concerns
articulated above warrant disqualification.   The district court's
conclusions are almost entirely drawn from the California court
decisions that analyze such conduct.   Defendants are correct that
bias or prejudice may be present even where a judicial officer
only relies upon knowledge properly gained during the course of
judicial proceedings:

> A favorable or unfavorable predisposition can also
> deserve to be characterized as "bias" or "prejudice"
> because, even though it springs from the facts adduced
> or the events occurring at trial, it is so extreme as
> to display clear inability to render fair judgment.

*Litkey*, 510 U.S. at 551.   However,

> "Partiality" does not refer to all favoritism, but only
> to such as is, for some reason, wrongful or
> inappropriate. Impartiality is not gullibility.
> Moreover, even if the pejorative connotation of
> "partiality" were not enough to import the
> "extrajudicial source" doctrine into § 455(a), the
> "reasonableness" limitation (recusal is required only
> if the judge's impartiality "might reasonably be
> questioned") would have the same effect. To demand the
> sort of "child-like innocence" that elimination of the
> "extrajudicial source" limitation would require is not
> reasonable.

*Id.* at 551-552.   All of the conclusions that are of concern to
Defendants were taken from the record of the habeas case.   The

essential inquiry in the habeas proceeding was whether the totality of the alleged errors -- ineffective assistance of counsel, witness unreliability, flawed investigative and interviewing techniques, failure to provide petitioner with impeachment information as to key prosecution witnesses, and cumulative prejudice at trial -- resulted in federal constitutional violations of due process, the right to effective assistance of counsel and, and the right to a fair trial, so as to destroy confidence in the integrity and reliability of the proceedings.  There was no need in the habeas proceedings to reach independent, severable, final determinations as to each matter of concern now raised by defendants.

That the district court, upon analyzing the record, reached conclusions that the convictions Weimer suffered did not withstand constitutional scrutiny does not warrant recusal.  *See e.g., United States v. Monaco*, 852 F.2d 1143, 1147 (9th Cir.1988) (comments by judge reflecting outrage at crime and failure of parties to take responsibility did not demonstrate pervasive bias warranting recusal from sentencing; comments were supported by the evidence presented during the course of sentencing process). Most important, an equal or greater basis for the court's finding of unreliability of the outcome of the state convictions was the ineffectiveness of Petitioner's counsel, whose failure of performance and errors cumulated to deny Petitioner a fair trial. Defendants have not cited a single case in which a judicial officer has been disqualified under even marginally similar circumstances.

### 4.   Comments regarding the minor children who testified.

The last category of comments that are of concern to Defendants relate to the reliability of testimony given by two minor children during the Weimer trial.  Specifically, the habeas corpus decision found:

> The two girls' uncorroborated testimony, the only evidence presented against Mr. Weimer, was unreliable and "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

(Habeas Corpus Decision at 121.)  Defendants assert that they "fully expect both of the young women (now adults) who testified against Mr. Weimer to confirm he abused them."  (Doc. 7 at 9.) In addition, Defendants assert that "there are other young women (now adults) who will also so testify."  (*Id.*)  Given the intent to present this evidence, Defendants maintain that "it is clear from the comments of the court that it will not believe the testimony of either young woman who testified at trial.  Thus, defendants are deprived of any reasonable chance to establish a defense that the crimes did, in fact, occur."  (*Id.*)

In making this accusation, Defendants reach an unsupportable conclusion.  In the habeas case, the district court found that defense counsel's failure to explore for their full impeaching effect witnesses' prior allegedly false reports and inconsistencies in prior statements rendered the overall outcome of the first trial unreliable.  Further questions about the reliability of the witness testimony were raised by questionable interviewing and investigation methods in contemporaneous child molestation cases.  The court made no judgments about the ultimate credibility of each witness, a question that is solely

reserved for the trier of fact, the jury.  The habeas corpus

decision does not express any opinion as to the County's capacity

to present such evidence here or the basis on which such witness

testimony will be evaluated.  The assigned judge  has not

prejudged the credibility of any witness who will testify in this

case.[6]


### 5.   Appearance of Impropriety.

Finally, Defendants point to Justice Kennedy's concurring

opinion in *Litkey*, in which he emphasized that "[t]he relevant

consideration under § 455(a) is the appearance of partiality, see

---

[6]    Plaintiff correctly points out that the inquiry
undertaken in a habeas case is substantially different from the
burden of proof that plaintiff will be required to meet in this
civil case.  In the *Weimer* habeas case, the district court
examined whether the actions of Plaintiffs trial counsel and
Defendants' actions combined to produce prejudicial
constitutional error.  Here, Plaintiff will be required to prove
by a preponderance of the evidence that Defendants are culpable
under prevailing civil rights laws.  The district court has not
prejudged any Defendant's responsibility under these standards.
Perhaps most importantly, the ultimate finder of fact in this
case will be a jury, not the district court.

Defendants assert that the different standards of proof "are
irrelevant considerations when determining whether the presiding
judicial officer is partial." (Doc. 3.)  Defendants are correct
that the different standards of proof are not <u>directly</u> relevant
to the recusal inquiry.  However, here, Defendants repeatedly
question the district court's ability to be impartial in a civil
rights case based upon conclusions reached in a habeas corpus
decision based in material part on the decisions of the state
courts and the California Attorney General.  The divergent
standards of proof are relevant insofar as they support the
conclusion that the expression of an opinion as to which party
should prevail in a habeas case does not necessarily predispose a
court to finding for the same party in a related civil rights
action.

23

*Liljeberg* [Health Serv. Acquisition Corp., 486 U.S.] at 860, not where it originated or how it was disclosed." *Litkey*, 510 U.S. at 558.  Essentially, Defendants suggest that, even if there is not sufficient evidence to demonstrate the type of pervasive bias required by the majority opinion in *Litkey*, there is sufficient appearance of impropriety here to warrant recusal.  With respect to this argument, the example cited by Justice Kennedy are telling.

> If, for instance, a judge presiding over a retrial
> should state, based upon facts adduced and opinions
> formed during the original cause, an intent to ensure
> that one side or the other shall prevail, there can be
> little doubt that he or she must recuse.  *Cf.*
> *Rugenstein v. Ottenheimer,* 78 Or. 371, 372, 152 P. 215,
> 216 (1915) (<u>reversing for judge's failure to disqualify</u>
> <u>himself on retrial, where judge had stated: "'This case</u>
> <u>may be tried again, and it will be tried before me. I</u>
> <u>will see to that. And I will see that the woman gets</u>
> <u>another verdict and judgment that will stand'</u> ")

*Id*.

The fact that the undersigned district judge issued a reasoned decision that reached a conclusion adverse to Defendants in the habeas case on different issues expresses no such intent "to ensure that one side or the other shall prevail" in this civil rights case.  The district court has no predisposition.

//
//
//
//
//
//
//
//

As noted at oral argument, the assigned judge has tried to verdict numerous jury trials in which Kern County and its Sheriff's Department and deputies have been defendants.  The Court has also decided scores of dispositive motions involving Kern County, its District Attorney, Sheriff, and Sheriffs' Deputies, ruling for and against these parties, always on the merits.  The Court has no bias against any party in this case.  No such suggestion has ever been previously made.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the motion for recusal is **DENIED**.


IT IS SO ORDERED.

**Dated:    December 29, 2006**            ___/s/ Oliver W. Wanger___
b2e55c                                 UNITED STATES DISTRICT JUDGE